Hill Design v. Hodgdon, et al.    CV-03-074-M    07/09/03

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Hill Design, Inc.

   v.                                        Civil No. 03-074-M
                                                    Op. No. 2003 DNH 116

Vivian Hodgdon, et al.

**REPORT AND RECOMMENDATION**

This Court issued a Report and Recommendation in the above-captioned matter on April 7, 2003 recommending that the Plaintiff's request for a preliminary injunction be granted in part and denied in part (hereinafter "April 7th Report"). Plaintiff filed an objection. By order dated May 27, 2003, the district court (McAuliffe, J.) declined to accept this Court's recommendation, and "recommitted the matter for reconsideration of the first sale doctrine in light of the relevant facts" (hereinafter "May 27th Order"). After reconsidering the evidence in the record, it is the opinion of this Court that 17 U.S.C. § 109(a) is applicable to the copies of BROWN BAG items sold by the Defendants. In addition, it is the recommendation of this Court that the district court use its equitable powers sparingly in this case because the evidence shows that the Plaintiff has unclean hands.

BACKGROUND

The findings of fact in the April 7th Report are not restated in their entirety here. Rather, the Court seeks to clarify certain of its findings in light of the May 27th Order.

I. <u>Agreement Between The Natkiels And Hodgdon</u>

During the course of the hearing and in its objection to the Report and Recommendation, counsel attempted to portray the relationship in which Ms. Hodgdon operated as "Art In Cooking" as one between her and Hill Design, Inc. ("HDI"). While counsel's efforts to establish this "spin" at the hearing may be legitimate, the effort to do so in the objection is, at best, misleading and, at worst, an intentional lack of candor to the court. I did not find such a relationship nor is one supported by the credible evidence.

In the fall of 2001 Plaintiff was essentially bankrupt. It had not produced product at its old Hill, New Hampshire site for years. It laid off its workers, closed its office and warehouse and ceased production at its Concord facility in October of 2001. Except to fill a few orders and to arrange a "straw" sale of items to Mrs. Natkiel's sister Helen Ross (at a bargain price in light of the Natkiels' later claims of value), Plaintiff ceased

2

to exist as an operating entity through at least the spring of 2002.

The only reasonable inference to be drawn is that the straw sale was to divert HDI product from its liquidating creditors to the benefit of the Natkiels.  What was left of HDI property not in the hands of the Natkiels was auctioned off by a bank creditor, including product, product labels and equipment.  From that moment, Mr. and Mrs. Natkiel, who owned and controlled HDI, treated it as defunct.  They acted as though they personally had all rights to direct the sale of the Ross inventory, to license the HDI intellectual property and to authorize use of HDI's Hill facilities.

Exhibit 23, from Mr. Natkiel's hand, is telling.  The Natkiels, not HDI, purported to license the HDI intellectual property.[1]  The Natkiels, not HDI, were to be paid royalties. The Helen Ross inventory was turned over to Hodgdon <u>by the Natkiels</u> who said they were fully authorized to do it.[2]  The Natkiels made the HDI facilities available to Hodgdon free of

---

[1]HDI is never even mentioned in the agreement.

[2]When defendant Carpenter approached Mr. Natkiel to buy $500.00 of the Ross inventory, he told her to complete the sale and pay Hodgdon who was authorized to sell for Art In Cooking.

3

charge through 12/31/04. While this agreement did not get signed there was part performance under it. Ms. Hodgdon, clearly an unsophisticated and inexperienced person in the business world, was used and abused by the Natkiels, particularly Mr. Natkiel, a self-acknowledged sophisticated business man.

The Natkiels agreed to train Hodgdon in the mixing of clay, pouring and casting, and finishing of cookie molds in contemplation of Hodgdon opening up her own production and distribution business for BROWN BAG products. April 7th Report at 5-7. I repeat, the evidence does not demonstrate that the Plaintiff, Hill Design, Inc., had a business deal or business negotiations with the Defendants. Rather, the evidence showed that Paul and Lucy Natkiel, in their individual capacities, purported to have the authority to grant Hodgdon a license to make and to distribute BROWN BAG items. See April 7th Report at 7 n.3; see also, Pl. Ex. 23; Df. Ex. H, I.

In exchange for the Natkiels' agreement to permit Hodgdon to use the Hill facility and to provide Hodgdon training, Hodgdon agreed to expend her labor and to commit her financial resources to the manufacture and distribution of BROWN BAG items. Hodgdon agreed to pay the Natkiels royalties based on her sales.

4

## II. Categories Of BROWN BAG Items Hodgdon Sold

This Court found from the evidence that Hodgdon sold three categories of BROWN BAG items after her business relationship with the Natkiels ended: (1) items from her personal collection of BROWN BAG products acquired while she was an HDI employee; (2) items Hodgdon made at the Hill facility; and (3) items from the "Helen Ross Inventory." See April 7th Report at 14. Plaintiff makes no copyright or trademark infringement claims based on the items in the first category, other than claims for Lanham Act § 43(a)(1) violations for false and misleading labeling. See Pl. Obj. to Rep. & Recomm. at 3 n.2. The Court does not find that from the evidence that Hodgdon applied false and misleading labels to the items from her personal collection.

Plaintiff stated in its objection to the April 7th Report that this Court determined that the second category of BROWN BAG items that Hodgdon sold included "copies Hodgdon made under HDI's supervision, control, and training, and using HDI's raw materials, production pouring molds, equipment, and facilities, while "negotiating" a license with it (the "HDI Inventory")." Pl. Obj. to Rep. & Recomm. at 3. This Court made no such finding. The Court rejects the "HDI Inventory" label for the

5

following reasons: (1) the Court did not find that Plaintiff was a party to the oral agreement or business negotiations with Hodgdon; and (2) the Court accepts as more credible Hodgdon's testimony that she primarily taught herself to fire molds, paid for the utilities and raw materials at the Hill facility, and supplied the labor to manufacture BROWN BAG items.

Adopting the label used erroneously and improperly by the Plaintiff, the district court observed that "there are any number of ways in which Hodgdon could have made the items in the HDI inventory, without obtaining legal ownership of them." May 27th Order at 8. This Court finds from the evidence that the only BROWN BAG items that Hodgdon made were lawfully made at the Hill facility under agreement with the Natkiels, by Ms. Hodgdon, from materials she owned and with resources she was lawfully using. The actual legal ownership of those material objects vested in Hodgdon.

III. Defendants' Sales Of BROWN BAG Items After April 11, 2002

In the April 7th Report, the Court recounted Hodgdon's testimony that on the morning of April 11, 2002, Hodgdon's attorney told her that Lucy Natkiel had "pulled the rug" on the deal. See April 7th Report at 8. Later in the report, the Court

recounted Hodgdon's testimony that it was her belief, after her conversation with Lucy Natkiel, that the business deal with the Natkiels had been put on hold pending completion of Plaintiff's settlement with its creditor. See April 7th Report at 13. Hodgdon testified that while her attorney had told her that the deal was off, Lucy Natkiel did not.

It is undisputed that Hodgdon did not seek permission from the Natkiels prior to removing items from the Hill facility. Helen Ross and unspecified attorneys subsequently contacted Hodgdon demanding that she return the items that she took. Hodgdon testified that she prepared a handwritten inventory and returned certain items on or about May 6, 2002. Hodgdon testified that she only intentionally retained items that she purchased for her company, items that she produced at the Hill facility with her own labor and at her own expense, and items from the Helen Ross Inventory that she needed to fill pending orders. Hodgdon testified that she continued to fill pending orders that were placed with her by former customers of HDI after April 11, 2002 because Paul Natkiel had arranged these sales and had promised those customers prior to that date that Hodgdon would fulfill their orders.

7

## DISCUSSION

### I. Application Of The First Sale Doctrine

The district court found that this Court's failure to find that Defendants Vivian Hodgdon and Art In Cooking, Inc. had any right to take and sell the items in Helen Ross Inventory necessarily rendered the first sale doctrine inapplicable with respect to Hodgdon's distribution of those items. See May 27th Order at 6-7. This misapplication of the law was properly corrected. The district court further found that the first sale doctrine is inapplicable to the "HDI Inventory" absent a finding that the Defendants had actual legal ownership of those items. Id. at 8. The district court requested that this Court make findings regarding whether and how Hodgdon's authorization under an oral license was affected by HDI's (actually the Natkiels') April 11, 2002 decision to "pull the rug" on the deal with Hodgdon.

With the exception of the BROWN BAG items from the Helen Ross Inventory, this Court finds that Hodgdon was the lawful owner of the BROWN BAG items that she sold after April 11, 2002. The Court finds from the evidence that the BROWN BAG items that Hodgdon made at the Hill facility were lawfully made under

8

agreement with the Natkiels, and that the Natkiels' decision to "pull the rug" on the deal with Hodgdon did not cause ownership of the material objects that Hodgdon made to revert to the Natkiels or to the Plaintiff.[3]  Plaintiff's ownership of the copyrights at issue is distinct from ownership of the material objects embodying the copyright.  <u>See</u> 17 U.S.C. § 202.  The cases cited by the Plaintiff in its objection, where courts enjoined the post-termination use of trademarks by former licensees, are inapposite.  <u>See</u> Pl. Obj. to Rep. & Recomm. at 10.

While a copyright owner has the exclusive right to distribute and to authorize distribution of copies of the copyrighted work under the Copyright Act, "[n]otwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright right owner, to sell or otherwise dispose of that copy or phonorecord."  17 U.S.C. § 109(a); <u>Precious Moments, Inc. v. La Infantil, Inc.</u>, 971 F. Supp. 66, 67 (D. Puerto Rico 1997).  As Plaintiff acknowledges in its objection, free alienation of

---

[3]Defendants have not contended that Hodgdon's ownership of the BROWN BAG items that Hodgdon made at the Hill facility carried with it a transfer of the copyright.  <u>Cf.</u>, <u>Forward v. Thorogood</u>, 758 F. Supp. 782, 784 n.3 (D. Mass. 1991).

9

copies is permitted where the particular copy was lawfully made or acquired.  See Pl. Obj. to Rep. & Recomm. at 6.  The evidence shows that Hodgdon's copies were lawfully made and acquired under Hodgdon's oral agreement with the Natkiels.

An analogous set of circumstances to the facts in the instant case appears in Bourne v. Walt Disney Company, 68 F.3d 621 (2d Cir. 1995).  In Bourne, the plaintiff contended that although the defendant had a license to use the plaintiff's copyrighted compositions "in synchronism with any and all of the motion pictures which may be made by [Disney]," nonetheless these rights did not permit Disney to distribute the compositions on videocassettes.  Id. at 623.  The plaintiff argued that even if the defendant lawfully possessed the videocassettes at issue, the defendant had not acquired those cassettes as the result of a "first sale" by the plaintiff, and therefore the first sale doctrine could not apply.  Id. at 632.  The court rejected the plaintiff's argument.  The court found that because the defendant had been licensed by the plaintiff to exploit the copyrighted compositions in connection with its motion pictures, the defendant should not be barred from being able to dispose of the lawfully made copies.  Id.

Similar to the facts in Bourne, the evidence in the instant case supports a finding that the BROWN BAG copies that Hodgdon made were lawfully made and owned by Hodgdon. Hodgdon agreed to pay the Natkiels a royalty based on her sales of those particular BROWN BAG copies. Although Hodgdon did not acquire the copies as the result of a "first sale," Hodgdon was still entitled to sell or otherwise dispose of those copies, even after the Natkiels decided to "pull the rug" on the licensing deal that they were negotiating. This Court finds that 17 U.S.C. § 109(a) is potentially applicable if Hodgdon's version of the facts is credited. Accordingly, this Court finds that the Plaintiff has not demonstrated that the Defendants' distribution of the BROWN BAG items that Hodgdon made lawfully at the Hill facility constituted copyright infringement under 17 U.S.C. § 501(a).

II.  Pervasive Evidence Of Unclean Hands

Plaintiff contends that this action arises out of the Defendants' scheme to sell infringing and unlawfully obtained BROWN BAG items. In contrast, Hodgdon contended at the injunction hearing that this lawsuit is in fact an offshoot of the Natkiels' scheme to use Hodgdon and her company to defraud the Plaintiff's creditor. Hodgdon contends that her relationship

with the Natkiels broke down only because Hodgdon's attorney sought to protect Hodgdon's interests with respect to Hodgdon's use of the Plaintiff's intellectual property. This Court finds from the current state of the record that Hodgdon's version of the facts is on the whole more credible. Because the evidence suggests to this Court that the Plaintiff has come to court seeking equitable relief with unclean hands, this Court recommends that any preliminary injunctive relief granted to the Plaintiff be limited.

The district court has wide discretion in deciding whether to deny a plaintiff's request for equitable relief based upon a plaintiff's alleged unclean hands. Donoghue v. IBC USA (Publ'ns), Inc., 70 F.3d 206, 281-219 (1st Cir. 1995); Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 880 (1st Cir. 1995) ("It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted in bad faith or with unclean hands."). The Supreme Court has explained that the doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."

12

Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945).  It is the opinion of this Court that the doctrine of unclean hands is properly invoked based upon the evidence in the record.

The evidence showed that the Plaintiff was in serious financial difficulty, with its assets subject to a creditor's lien, when it closed its Concord facility and liquidated its inventory.  Paul Natkiel, a sophisticated businessman, encouraged Hodgdon, who had been laid off by the Plaintiff, to start a business making and selling the Plaintiff's copyrighted items while the Plaintiff was essentially defunct.  At the relevant time, Hodgdon was comparatively unsophisticated in business matters, but was devoted to the Plaintiff's BROWN BAG line.

Before being laid off, Hodgdon assembled a collection of items in the Concord inventory that she thought could save the Plaintiff's BROWN BAG line.  Hodgdon later requested to buy these items prior to the liquidation of the Plaintiff's inventory.  While denying Hodgdon's request, the Plaintiff purportedly sold them to Lucy Natkiel's sister, Helen Ross, for $5,000.[4]  Df. Ex.

_____

[4]A review of Paul Natkiel's testimony suggests that Helen Ross was merely a straw purchaser.  Paul Natkiel testified that after his initial conversations with Hodgdon about saving the BROWN BAG line, he realized that "[t]he very first step would be

A.  This sale took place within two weeks of the auction of the Plaintiff's Concord inventory to satisfy obligations to its creditor.  Plaintiff directed Hodgdon and others to store those items in trailers at the Hill facility.  Paul Natkiel encouraged Hodgdon to sell the inventory and directed former HDI customers to Hodgdon for order fulfillment.

Despite having sold the Helen Ross Inventory for $5,000, Plaintiff alleges in this lawsuit that the value of that inventory was almost $48,000.  See Ver. Compl. at ¶ 36.  The estimated value of the inventory increases further still at other places in the record.  In the license agreement drafted by Paul Natkiel, the agreement provided that Hodgdon was to credit Helen Ross for the beginning product inventory and to carry that inventory on her company's books "for an amount not to exceed $60,000."  See Pl. Ex. 23 at 3.  Paul Natkiel represented to Defendant Pat Carpenter that Hodgdon's company owned the Helen Ross Inventory and that there was an amount sufficient to serve

to secure part of the inventory out of the liquidation so that we would have a place to start."  He went on to testify that Hodgdon suggested the inventory that might be of value, and then "[w]e negotiated with the bank and purchased part of that inventory and it was moved to Hill . . . ."  Neither Helen Ross, nor any representative from Cookie Art Exchange, the entity for whom the inventory was purportedly held, testified at the injunction hearing.  See Df. Ex. A.

as collateral for Carpenter's potential $100,000 investment.  <u>See</u> April 7th Report at 11-12.

Plaintiff further alleges in the Verified Complaint that Hodgdon breached an agreement to repay a loan by the Natkiels of $5,175.64.[5]  <u>See</u> Ver. Compl. at ¶¶ 69-72.  Hodgdon testified that Paul Natkiel signed over to her checks written to the Plaintiff, during the time that the Plaintiff was still in negotiations with its creditor.  Hodgdon contends that these checks were signed over to her to cover severance pay owed to her.  <u>See</u> Df. Ex. O. Hodgdon contends that she spent this money on equipment and raw materials for her business.  For example, Hodgdon testified that Paul Natkiel harangued her into purchasing kilns.  <u>See</u> Df. Ex. B. Hodgdon testified that as of the date of the injunction hearing, she had never used those kilns.

While the evidence shows that the Plaintiff is the only named owner of the federal copyright and trademark registrations at issue in this lawsuit (<u>see</u> Pl. Ex. 1-2), the draft license agreement shows that the Natkiels treated the Plaintiff as their alter ego.  Unbeknownst to Plaintiff's creditors, the Natkiels purported to have the authority, in their individual capacities,

---

[5]Even if this allegation were true, the claim would belong to the Natkiels not the Plaintiff.

15

to grant Hodgdon a license to make, purchase or market current or future BROWN BAG items. See Pl. Ex. 23 at 1. The Court finds that the Natkiels did grant Hodgdon an oral license to the Plaintiff's intellectual property until April 11, 2002, a finding the Plaintiff has not disputed.

Having encouraged Hodgdon to start a business with the express purpose of making and distributing BROWN BAG items, the evidence shows that the Natkiels discouraged Hodgdon's efforts to ensure that her company could use the Plaintiff's intellectual property without objection or exposure to claims by the Plaintiff's creditor. Lucy Natkiel testified that when the Natkiels began negotiations with Hodgdon, the Plaintiff's creditor had not chosen to exercise its rights against the Plaintiff's copyrights. See April 7th Report at 8-9. The Natkiels did not want the creditor to believe that the Plaintiff's copyrights had value for fear that the information would cause the creditor to seek more money in a settlement.

The evidence suggests that the relationship between the Natkiels and Hodgdon began to unravel after Paul Natkiel solicited Pat Carpenter's investment in Hodgdon's business. Carpenter testified that she made arrangements to transfer money

16

for her investment in Hodgdon's business, but became nervous about the Natkiels' inability to produce a contract, and about the Natkiels' unresolved negotiations with the Plaintiff's creditor. Carpenter testified that she then became nervous for Hodgdon, and the possible loss that she might experience, as a result of all of the time and money that Hodgdon had been spending on her business. Carpenter recommended to Hodgdon that she contact an attorney, which she did. The evidence showed that Lucy Natkiel decided to "pull the rug" on the deal after having an argument with Hodgdon's attorney.

In light of all of the facts recited above, this Court finds from the evidence that the Natkiels used Hodgdon to exploit a valuable part of the Plaintiff's then former business while at the same time keeping assets away from Plaintiff's creditor. Now, in the face of the Natkiels' encouragement to Hodgdon to start a business making and distributing BROWN BAG items, and Paul Natkiel's promises to customers that Hodgdon would fulfill their orders, the Plaintiff seeks equitable relief from the court that could leave Hodgdon in the lurch, potentially responsible for breach of contracts entered into at Paul Natkiel's behest. If HDI had a role it was by and through its then stockholders and

officers, the Natkiels.  This Court finds that the Plaintiff is tainted by the Natkiels' unclean hands with respect to the claims before this Court.  Therefore, this Court recommends that any equitable relief granted to Plaintiff be limited.  Donoghue, 70 F.3d at 281-219; Texaco Puerto Rico, 60 F.3d 867, 880 (1st Cir. 1995).  In particular, this Court recommends that the Defendants not be enjoined from selling items from the Helen Ross Inventory to fill outstanding contracts pre-dating April 11, 2002, or BROWN BAG items that Hodgdon made lawfully at the Hill facility under an oral agreement with the Natkiels.

Any objections to this Report and Recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Committee v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

_____
James R. Muirhead
United States Magistrate Judge

Date:   July 9, 2003
cc:     David P. Eby, Esq.
        Garfield B. Goodrum, Jr., Esq.
        Vivian Hodgdon, pro se
        Edmund J. Waters, Jr., Esq.

18